

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-18-2000

# In Re: PWS Holding

Precedential or Non-Precedential:

Docket 00-5042

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"In Re: PWS Holding" (2000). *2000 Decisions.* Paper 199.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/199

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 18, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-5042 and 00-5074

In re: PWS HOLDING CORPORATION
BRUNO'S, INC; FOOD MAX OF MISSISSIPPI, INC;
A.F. STORES, INC; BR AIR, INC.;
FOOD MAX OF GEORGIA, INC;
FOOD MAX OF TENNESSEE, INC;
FOODMAX, INC; LAKESHORE FOODS, INC;
BRUNO'S FOOD STORES, INC; GEORGIA SALES
COMPANY; SSS ENTERPRISE, INC

W.R. Huff Asset Management Co., L.L.C.,
Appellant in 00-5042

HSBC BANK USA, as Indenture Trustee for
the 10.5% Senior Subordinated Notes,
Appellant in 00-5074

On Appeal From the United States District Court
for the District of Delaware
(D.C. Civ. No. 98-cv-00212)
District Judge: Honorable Sue L. Robinson

Argued: March 10, 2000

Before: BECKER, Chief Judge, SCIRICA and
NYGAARD Circuit Judges.

(Filed: September 18, 2000)

EDWARD S. WEISFELNER,
 ESQUIRE (ARGUED)
ANDREW DASH, ESQUIRE
JOHN P. BIEDERMANN, ESQUIRE
Berlack, Israels & Liberman
120 West 45th Street
New York, NY 10036

STEVEN K. KORTANEK, ESQUIRE
JOANNE B. WILLS, ESQUIRE
Klehr, Harrison, Harvey, Branzburg
& Ellers, LLP
919 Market Street, Suite 1000
Wilmington, DE 19801

Counsel for Appellant
W.R. Huff Asset Management Co.

PETER D. WOLFSON, ESQUIRE
 (ARGUED)
CAROL NEVILLE, ESQUIRE
Pryor, Cashman, Sherman & Flynn,
LLP
410 Park Avenue
New York, NY 10022-4441

JEFFREY C. WISLER, ESQUIRE
Connolly, Bove, Lodge & Hutz
1220 Market Building
P.O. Box 2207
Wilmington, DE 19899

Counsel for Appellant
HSBC Bank USA, Indenture Trustee

HARVEY R. MILLER, ESQUIRE
 (ARGUED)
LORI R. FIFE, ESQUIRE
MARC D. PUNTUS, ESQUIRE
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153

2

THOMAS L. AMBRO, ESQUIRE
DANIEL J. DeFRANCESCHI,
 ESQUIRE
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Counsel for Appellees PWS Holding
Corp.; Bruno's, Inc.; Food Max of MI,
Inc.; AF Stores, Inc.; BR Air, Inc.;
Food Max of GA, Inc.; Food Max of
TN, Inc.; Foodmax Inc.; Lakeshore
Foods, Inc.; Brunos Food Stores;
Georgia Sales Co.; SSS Entr, Inc.

HAROLD S. NOVIKOFF, ESQUIRE
 (ARGUED)
AMY R. WOLF, ESQUIRE
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019

EDWARD G. BIESTER, III, ESQUIRE
Duane, Morris & Heckscher
4200 One Liberty Place
Philadelphia, PA 19103-7396

TERESA K.D. CURRIER, ESQUIRE
Duane, Morris & Heckscher
1201 Market Street, Suite 1500
P.O. Box 195
Wilmington, DE 19899

Counsel for Appellee
Chase Manhattan Bank

DENNIS S. KAYES, ESQUIRE
 (ARGUED)
STUART E. HERTZBERG, ESQUIRE
I. WILLIAM COHEN, ESQUIRE
Pepper, Hamilton, LLP
100 Renaissance Center, 36th Floor
Detroit, MI 48243

DAVID M. FOURNIER, ESQUIRE
MONICA LEIGH LOFTIN, ESQUIRE
Pepper, Hamilton, LLP
1201 Market Street, Suite 1600
Wilmington, DE 19801

Counsel for Appellee Official
Committee of Unsecured Creditors

OPINION OF THE COURT

BECKER, Chief Judge.

W.R. Huff Asset Management Co., L.L.C. ("Huff "), and HSBC Bank USA ("HSBC") appeal from the order of the District Court confirming a reorganization plan for Bruno's, Inc., (Bruno's), and several affiliates.1 Bruno's is based in Alabama and operates a chain of supermarkets in the southeastern United States. Huff was the holder of $290 million in Bruno's subordinated notes; HSBC was the indenture trustee for the subordinated notes (we refer to them together as Huff). They argue that the District Court should not have confirmed the plan for a host of reasons, most notably because it contains releases that violate the absolute priority rule of 11 U.S.C. S 1129(b)(2)(B)(ii) and are thus impermissible under the Bankruptcy Code.

Three separate interests have appeared to defend the plan: the debtors and debtors-in-possession (referred to throughout as the Debtors); the Chase Manhattan Bank, representing the group of banks (the Banks) that were the senior lenders to Bruno's before the reorganization; and the Official Unsecured Creditors' Committee. Together they contend that the plan does not violate the absolute priority rule because the releases were not granted "on account of " the interests of the released parties, but rather the claims released had little or no value.

_____

1. The affiliates are PWS Holding Corp., Food Max of Mississippi, Inc, A.F. Stores, Inc., BR Air, Inc., Food Max of Georgia, Inc., Food Max of Tennessee, Inc., FoodMax, Inc., Lakeshore Foods, Inc., Bruno's Foodstores, Inc., Georgia Sales Co., and SSS Enterprises, Inc.

4

The absolute priority rule, found in 11 U.S.C. S 1129(b)(2)(B)(ii), provides that "the holder of any claim or interest that is junior to the claims of [a class of unsecured claims] will not receive or retain under the plan on account of such junior claim or interest any property." In Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership, 526 U.S. 434 (1999), the Supreme Court interpreted the "on account of " language in S (b)(2)(ii). The Court rejected arguments that "on account of " means "in satisfaction of " the interest or "in exchange for" the interest and concluded that it means"because of " the interest. Id. at 450–51. Accordingly, a causal connection between holding the prior claim or interest, and receiving or retaining property, will trigger the absolute priority rule. Huff submits that this plan, by releasing claims held by the bankrupt entity that arose out of the leveraged recapitalization, essentially transferred property to holders of junior equity in violation of the absolute priority rule. Huff argues that the release was a transfer to junior equity because the potential claims included claims against junior equity--affiliates of Kohlberg, Kravis, Roberts & Co., L.L.C. (KKR), and other participants in the recapitalization. Huff contends that the transfer violated the absolute priority rule because senior creditors (including Huff) had not been paid in full.

We conclude that the District Court did not err in the challenged respects.2 The Examiner appointed by the District Court under 11 U.S.C. SS 1104(c) and 105(a) at the behest of Huff found in a comprehensive report that the claims released had little potential merit. We find no error in the District Court's decision to accept the Examiner's findings and legal conclusions regarding the viability of the claims, and we reject Huff 's contention that the releases were granted "on account of " old equity's interest. We also reject the Debtors' contention that the challenge to confirmation is equitably moot under In re Continental Airlines, 91 F.3d 553, 559 (3d Cir. 1996) (en banc).

_____

2. Because the order of reference to the Bankruptcy Court was withdrawn in the District of Delaware, this case was heard initially in the
District Court.

5

Huff 's other challenges to confirmation include that the plan should not have been confirmed because the District Court erred in determining that it was proposed in good faith as required by 11 U.S.C. S1129(a)(3). Huff has not offered anything but innuendo to support its contention that the Debtors violated this portion of the Code, and we find no error in the District Court's conclusion that the plan was proposed in good faith.

Additionally, Huff contends that the plan should not have been confirmed because it violates the following sections of the Bankruptcy Code: 11 U.S.C. S 510(a), which provides that a "subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law;" 11 U.S.C. S 524(e), which provides that "[e]xcept as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt;" 11 U.S.C. S 363, which governs the sale of assets outside of the reorganization plan; 11 U.S.C. S 1129(a)(2), which provides that a court shall confirm a plan only if "[t]he proponent of the plan complies with the applicable provisions of this Title;" and 11 U.S.C. S 1129(a)(7), which provides that a court shall confirm a plan only if the debtor demonstrated at the Confirmation Hearing that creditors rejecting the plan would not receive a greater recovery in a Chapter 7 liquidation.

We reject Huff 's argument under S 510(a) because the subordinated noteholders' rights under the agreement do not arise until the senior indebtedness is paid in full, which has not happened under the plan. We reject the S 524(e) argument because we conclude that the limited release in Paragraph 58 of the plan does not come within the meaning of S 524(e) and is consistent with the standard of liability under the Code. We reject Huff 's S 363 argument because we do not agree with the contention that the Plan triggered a duty to fully market the company. We conclude that Huff does not have standing to raise the challenge under S 1129(a)(2) because third-party standing is limited on appeal in bankruptcy cases and Huff cannot show that it was personally aggrieved by any alleged failure of

6

disclosure. Finally, because we are satisfied that the Debtors met the S 1129(a)(7) burden of demonstrating that the creditors would not receive a greater recovery under Chapter 7, we reject the challenge under this section as well. We will therefore affirm the order of the District Court confirming the plan.

I. Factual & Procedural Background

As of the commencement date of the Chapter 11 cases, Bruno's was a chain of about 200 supermarkets operating in the southeastern United States (principally in Alabama). In 1995, affiliates of KKR acquired an 83.33% interest in Bruno's in a leveraged recapitalization. As part of this transaction, then existing shareholders of Bruno's were bought out for approximately $880 million. The leveraged recapitalization was financed by a revolving credit and term loan facility provided by the Banks, an equity contribution of $250 million by KKR through Crimson Associates LLP, and the issuance by Bruno's of $400 million in notes due in 2005 pursuant to an indenture. Section 9 of the indenture contains a subordination clause that provides that the noteholders' claims are fully subordinated to the payment in full (including interest) of the claims of the senior lenders (the Banks).

For at least two years following the leveraged recapitalization, Bruno's paid all of its debts as they matured (including $97.5 million in interest payments on the subordinated notes). In the summer of 1997, the Debtors were able to refinance the Bank debt relating to the recapitalization at a lower interest rate and on terms more favorable than the original terms. But by the second half of 1997, as a result of either mismanagement by the directors selected by KKR and a controversial change in pricing policy (according to Huff), or as a result of a greatly increased level of competition in the market (according to the Debtors), Bruno's began to falter. Bruno's had difficulty in meeting payment obligations from the recapitalization and in paying its suppliers and other creditors. On February 2, 1998, it filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since thefiling date, the Debtors have remained in possession.

7

As of the filing date, Bruno's owed approximately $462 million to the Banks, $135 million to trade vendors, suppliers, and other unsecured creditors, and $421 million on the subordinated notes. In the 90 days prior tofiling for relief, it made payments to a variety of creditors and suppliers amounting to more than $600 million, including to firms that provided professional services to the Debtors.3 However, the only preference action the Debtors pursued was an action against the Banks seeking to avoid liens granted to the prepetition lenders in December 1997.

In February 1998, the Bankruptcy Trustee appointed a nine member "Official Unsecured Creditor's Committee" (the Committee). Huff, holder of $290 million in subordinated notes, was the largest creditor of the estate and was elected co-chair of the Committee. The other members of the Committee included four representatives of the Banks, three representatives from the trade, and one representative of the other subordinated noteholders. A representative from the United Food and Commercial Workers Union, which represented supermarket employees of Bruno's, was appointed to serve on the Committee from March 1998 to April 1999.

In October 1998, the Debtors presented a business plan to the Committee. The Committee rejected this plan and then appointed a subcommittee, the "Strategic Alternatives Committee," to work with the Debtors to develop a new plan. This Subcommittee conducted a test marketing of the enterprise and sent out a summary information package to two different sets of potential buyers (neither of which included financial buyers). The Subcommittee did not believe that there would be interest in purchasing the enterprise, and indeed none of the companies contacted expressed an interest. By January 1999, the Debtors concluded that no potential buyers had an interest in the acquisition.

_____

3. For example, payments to suppliers included approximately $19 million to Kraft Foods, $4.1 million to Frito-Lay, and $750,000 to Pillsbury. Payments to providers of professional services included $225,551.69 to Cravath, Swaine & Moore, $1.2 million to KKR, and $232,838.71 to Wasserstein Perella & Co.

Throughout the spring of 1999, the Committee and subgroups of the Committee convened several times to develop a reorganization plan. Huff asserts that it was excluded from these meetings and that many of the conferees pursued some interest other than maximizing the size of the bankruptcy estate. In March 1999, the Debtors' law firm determined that legal claims arising out of the leveraged recapitalization (primarily fraudulent transfer claims) were not worth pursuing because they believed that the claims were unlikely to succeed and that litigation would be expensive, time consuming, complicated, protracted and vigorously defended, and likely would delay the confirmation of the reorganization plan. In April 1999, the Committee voted to deny funds to pursue the claims, while preserving the claims for further consideration. In response, Huff successfully moved for the appointment of an independent examiner to evaluate the claims. The Debtors presented the first version of the new plan in May 1999. It was revised several times between May and December 1999.

As a part of the negotiations regarding reorganization, three independent entities (Wasserstein Perella & Co. (for the Debtors), PricewaterhouseCoopers (for the Committee), and Chilimark Partners (for the Banks)) conducted assessments of the Debtors and reported current value estimations ranging between $260 and $315 million. Huff 's expert argued for a valuation at $580 million, but this valuation was rejected by the District Court, and Huff appears to have abandoned any argument for it on appeal. HSBC still appears to contend that the reorganized enterprise was "significantly undervalued by the Debtors and the Bank Group." HSBC does not, however, argue that the District Court committed clear error in determining that the reorganization value of the Debtors was "substantially below the amount necessary to allow for the satisfaction in full of the Bank claims" and thus that Huff and the other holders of subordinated notes were substantially out of the money (by about $300 million). The interests of the holders of the subordinated notes, including Huff and HSBC, were thus wiped out and, by operation of the Code, 11 U.S.C. S 1126(g), the holders are deemed to have rejected the plan.

9

Huff and HSBC challenge three separate releases of legal claims included in the plan. We describe the different releases in the three following subsections, sections I.A–C.

A.

The first releases pertain to the estate's claims arising out of the leveraged recapitalization. These releases include "avoidance claims" that, if successful, could have allowed the Debtors to avoid certain aspects of the 1995 leveraged recapitalization. In late 1998, the Debtors, with the consent of the Committee, undertook a review of the leveraged recapitalization to determine if any viable fraudulent transfer claims existed and should be pursued. In March 1999, the Debtors' counsel Weil, Gotshal & Manges completed a 100 page report analyzing the claims, concluding that the transaction was not a fraudulent transfer and that there were no viable claims against any of its participants. In April 1999, the Committee nevertheless voted to preserve these causes of action in the plan. One month later, however, the Committee reversed its position and, with the support of the trade representatives and the Banks, voted to support the plan releasing the claims.

Huff and HSBC objected to these releases and, as noted, successfully moved the District Court for the appointment of an Examiner to evaluate the claims. The District Court appointed Harrison J. Goldin as Examiner. The Examiner's Final Report, prepared with the aid of eminent counsel, made extensive findings of fact regarding the leveraged recapitalization.[4] The Examiner adopted a model for assessing the viability of the claims that broke the probability of success into five categories. Under the model, the Examiner concluded that a claim was "highly likely" to succeed if he believed that it had an 80% or greater chance of success; "likely" if the Examiner believed that it had a 60% to 80% chance of success; "reasonable" if the Examiner believed that the likelihood of success was between 40% and 60%; "unlikely" if the Examiner believed its chance of success was only between 20% and 40%; and

---

4. The Examiner interviewed 19 people and reviewed approximately 75,000 pages of documents relating to the transaction.

10

"remote" if the Examiner concluded that there was less than a 20% chance of success.

As the report details, in August 1995, certain affiliates of KKR, including an Alabama corporation formed for the transaction, Crimson Associates LLP (of which KKR is the general partner), acquired 83.33% of the stock of Bruno's. To pay for this transaction, Bruno's and its affiliated Debtors obtained cash and credit through the issuance of $400 million in notes, a $475 million term loan facility from Chemical Bank, and a $125 million revolving credit facility from Chemical Bank (from which approximately $10 million was drawn to fund the 1995 transaction). KKR and its affiliates contributed $250 million, and Bruno's applied $20 million of its existing cash to the transaction.

The net cash proceeds were allocated to the following principal uses: (1) payment of $880.1 million of cash merger consideration to the pre-closing shareholders (the purchase of Bruno's pre-transaction outstanding common stock at $12.00 per share); (2) repayment of $200 million plus accrued interest in pre-transaction indebtedness; and (3) payment of approximately $40 million in fees and expenses related to the merger.[5] The Examiner hired Goldin Associates, L.L.C., to perform a detailed financial analysis of the recapitalization. The analysis covered two principal issues regarding Bruno's at the time of the recapitalization: the solvency of Bruno's, and the adequacy of Bruno's' capital resources to meet its future needs, including its ability to pay its debts and satisfy its liabilities as due. These issues are important to analyzing the claims arising out of the recapitalization because the viability of the claims depends on whether the recapitalization left Bruno's insolvent or with an unreasonably small amount of assets in relation to the business or the transaction. If the value of the assets acquired in the recapitalization does not exceed the debt incurred, or if the business was left with unreasonably small capital, the transaction may be a

_____

5. These fees and expenses included $15 million in fees to KKR, more than $14 million to Chase, and more than $10 million to BT Securities for underwriting fees and intrabank funding costs.

11

"fraudulent transfer." Transactions in violation of the prohibition on fraudulent transfers can be avoided. 6

The test of solvency is whether, at the time of the recapitalization, the company's assets exceeded its liabilities. There are two basic approaches to this evaluation: asset by asset evaluation, which ascribes value to each asset and determines solvency by comparing the sum of those assets to total liabilities, and enterprise valuation, which values the business as a going concern and includes intangibles such as relationships with customers and suppliers, and the name, profile, and reputation of the business.7 The Examiner concluded that it was likely (i.e., that there was a 60-80% chance) that a court would apply the business enterprise analysis. The Examiner believed that the business enterprise evaluation was the appropriate measure of solvency because KKR acquired Bruno's as a going concern.

Under the business enterprise evaluation, the Examiner performed three separate analyses: a comparable public company analysis, a comparable acquisitions analysis, and a discounted cash flow analysis. The Examiner found that in all but one of the relevant formulations, Bruno's was solvent at the time of the recapitalization. The approach favored by the Examiner, comparing enterprise value derived from a discounted cash flow analysis to long-term debt, reflected that the enterprise value of Bruno's exceeded its long-term debt by approximately $270 million to $690 million. The valuation is a range because the Examiner used three earnings amounts: sales, EBITDA (earnings

_____

6. Fraudulent transfer actions may be brought by a debtor-in-possession under S 548 of the Code, see 11 U.S.C.S 548, and, pursuant to S 544(b) of the Code, under applicable state fraudulent transfer statutes, see 11 U.S.C. S 544(b). Because the recapitalization occurred approximately two and one-half years before the commencement of the Chapter 11 cases, S 548 is inapplicable, and hence any fraudulent transfer claims would have to be brought under state law through S 544(b) of the Code.

7. In assessing liabilities, the Examiner considered the bank loans, subordinated notes, capital lease obligations, deferred tax liability, and contingent and other off-balance sheet liabilities. The Examiner concluded that no material adjustments to the balance sheet liabilities were required for purposes of the solvency analysis.

12

before interest, taxes, depreciation, and amortization), and EBIT (earnings before interest and taxes). The trading market enterprise value is divided by these earning amounts to derive multiples, which are applied to Bruno's' earnings totals to derive valuation.

The other methods of analyzing solvency also resulted in a range because the Examiner considered multiple earnings amounts. The "assets to liabilities" construct, comparing total adjusted enterprise value derived from a discounted cash flow analysis to total liabilities, showed that Bruno's was solvent by approximately $215 to $635 million. The acquisition multiples test, which gives greater weight to an acquisition premium, also indicated that Bruno's was solvent, with assets of approximately $188 million to $250 million, using multiples of EBITDA and EBIT, respectively (and higher if the multiple of sales is applied). 8 The market multiples solvency test, which does not include a control premium, produced lower margins of solvency ranging from approximately $27 to $104 million. The only test which indicated insolvency applied a southeast sales multiple. Under this test, the Examiner considered the sales earnings amount for comparable enterprises operating in the southeastern United States only.

The Examiner concluded that the southeast sales test was an inappropriate means of measuring the solvency of Bruno's and, in any event, should be given less weight than the other valuations standards. The Examiner also noted that the purchase price itself was probative of Bruno's' value (and thus solvency). The purchase price indicated an enterprise value of $1.2 billion, which exceeded long-term debt by approximately $245 million. Adding current liabilities of $156.4 million, the sum exceeded total liabilities by about $90 million.9 Although he deemed it unlikely that a court would apply the asset-by-asset test,

_____

8. The Examiner considered the sales multiple to be a less appropriate measure of solvency than EBITDA and EBIT.

9. The Examiner's Report appears to contain an arithmetical or typographical error in that it concludes from the above numbers that the sum exceeded total liabilities by over $190 million, rather than $90 million. Nothing in this case turns on this point, however.

13

the Examiner also conducted an analysis under the asset-by-asset methodology. The sum of Bruno's assets, valued piecemeal, was $1,024.8 million. The assets did not exceed the total of liabilities, which were $1,114.1 million.

Additionally, the Examiner analyzed whether the recapitalization left Bruno's with unreasonably small capital. The critical question is whether the parties' projections were reasonable at the time of the transaction. The analysis looked at historical data, such as cashflow, net sales, gross profit margins, and net profits and losses, and whether the parties considered difficulties that might arise, such as interest rates fluctuations and market downturns, to gauge the reasonableness of the projections in light of working capital needs in the industry and actual cash available to service needs. Actual performance of the debtor following the transaction is evidence of whether the parties' projections were reasonable.

The Examiner opined that Bruno's was not undercapitalized. He concluded that at the time of the recapitalization Bruno's was a viable enterprise capable of substantial improvement, and that the parties' projections, although aggressive in some areas, were conservative in others. The enterprise failed, in his opinion, not because of inadequate capital, but because a series of unfortunate decisions, including a change in pricing strategy and a decision to close one distribution center, caused substantial erosion in the company's customer base. Declining demand for Bruno's' services resulted in declining revenue, which led to the bankruptcy.

In part because of these conclusions, the Examiner opined that any claims arising out of the recapitalization were unlikely to succeed (i.e., that they had only a 20-40% chance of success). He reasoned that "the Recapitalization differed fundamentally from prior-leveraged transactions that have been found to be unlawful; among other things, the risks of the transaction were borne by the acquirer (KKR) and the lenders (who were unsecured), rather than shifted onto pre-transaction creditors." The Examiner also concluded that the claims were "not promising," were "limited and speculative," that "significant defenses" were available to each of the principal participants, the former

14

shareholders, the Banks, the subordinated noteholders, and KKR in the recapitalization, and that

> [i]n light of the multiple legal and factual obstacles to any substantial fraudulent transfer or illegal distribution recovery by the Debtors [relating to the recapitalization], the examiner believes that the prosecution of such claims is extremely difficult to justify . . . . As a legal matter, the laws of the governing jurisdiction (Alabama, and, if suit is filed in Delaware, the Third Circuit) present formidable obstacles to recovery from the principal defendants.

The releases of these claims do not cover any direct, personal, non-derivative claims held by creditors against non-debtor third parties. The releases do extinguish many if not all of the claims arising out of the recapitalization that could have been pursued by the Debtors or on their behalf. The parties do not dispute the findings of fact included in the Examiner's Final Report. Huff and HSBC argue, however, that the Examiner's (and the District Court's) conclusion that there was little value to be had from the claims was flawed because it depended on the Examiner's conclusion that Bruno's was left solvent after the recapitalization. Huff argues that the Examiner erred in adopting the enterprise valuation approach.

B.

The second issue regarding the releases has to do with Paragraph 58 of the Confirmation order, which releases Committee members and professionals who provided services after the petition date from certain liability for their work in the reorganization. The release in Paragraph 58 is limited to claims brought in connection with work on the bankruptcy reorganization plan, and it does not eliminate liability but rather limits it to willful misconduct or gross negligence. Huff and HSBC nevertheless argue that this release violates S 524(e) of the Bankruptcy Code because it affects the liability of another entity for the debt of the Debtors. The Debtors respond that the releases do not come within the meaning of S 524(e) and were consistent with the standard of liability under the Code.

15

C.

The third set of claims concern the waiver of preferences, i.e., preference claims to recover from trade creditors and suppliers for payments made in the 90 days prior tofiling for bankruptcy. As noted above, the Debtors paid out substantial sums of money during this period. Under bankruptcy law, such payments can be recovered by the estate; S 547 of the Bankruptcy Code vests exclusive discretion to prosecute or not prosecute preference claims with the trustee or debtor-in-possession. Afterfiling, the Debtors pursued a preference action against the Banks, seeking to avoid certain liens granted to the Banks within 90 days of the filing. The action settled; the Banks agreed to release the liens granted just prior to the bankruptcy filing against property and assets of the Debtors and, in exchange, the Debtors agreed to pay the fees and expenses of the Banks' attorneys throughout the Chapter 11 case. The Debtors waived many other preference actions. The Debtors represent that they decided to waive these claims as a part of the reorganization plan in order to facilitate and rehabilitate post-reorganization relationships with key suppliers.

D.

The District Court confirmed the Debtors' reorganization plan after a three day hearing. The confirmation order was issued by the District Court pursuant to 28 U.S.C.S 1334, which grants jurisdiction to the district courts over bankruptcy matters. Because this is an appeal from a district court exercising original jurisdiction in bankruptcy, our jurisdiction stems from 28 U.S.C. S 1291 rather than 28 U.S.C. S 158(d). See In re Marvel Entertainment Group, Inc., 140 F.3d 463, 470 (3d Cir. 1998). The confirmation order was a final appealable order. See id.  at 469. We review the District Court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof. See In re Environmental Energy, Inc., 188 F.3d 116, 122 (3d Cir. 1999).

II. Equitable Mootness

Under the doctrine of equitable mootness, an appeal should be dismissed, even if the court has jurisdiction and

16

could fashion relief, if the implementation of that relief would be inequitable. See In re Continental Airlines, 91 F.3d 553, 559 (3d Cir. 1996) (Continental I). As we noted in Continental I, "[t]he use of the word`mootness' as a shortcut for a court's decision that the fait accompli of a plan confirmation should preclude further judicial proceedings has led to unfortunate confusion" between equitable mootness and constitutional mootness. Id. Constitutional mootness implicates the Article III case or controversy requirement; an appeal is moot in the constitutional sense only if events have taken place that make it "impossible for the court to grant `any effectual relief whatever.' " Church of Scientology of Calif. v. United States, 506 U.S. 9, 12 (1992) (citation omitted). Equitable mootness is a broader concept that has developed in bankruptcy law. It provides that that "[a]n appeal should . . . be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." Continental I , 91 F.3d at 558 (citing In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993)).

In Continental I, we dismissed the appeal after finding it equitably moot because the appeal had an "integral nexus" with the feasibility of the Continental Debtors' plan of reorganization. Id. at 564. The Court identified prudential factors with which to evaluate equitable mootness, including whether the plan has been substantially consummated or stayed, whether the requested relief would affect the rights of other parties, whether the requested relief would affect the success of the plan, and whether it would further the public policy of affording finality to bankruptcy judgments. See id. at 560. These factors are given varying weight, depending on the particular circumstances, but the foremost consideration is whether the reorganization plan has been substantially consummated. See id. "This is especially so where the reorganization involves intricate transactions . . . or where outside investors have relied on the confirmation of the plan." Id. at 560-61 (citations omitted). We have also noted, however, that the doctrine is "limited in scope and [should be] cautiously applied," id. at 559, and that it involves "a

17

discretionary balancing of equitable and prudential factors,"
id. at 560.

The Debtors here argue that, since the stay was denied
and the reorganization has gone forward, this appeal is
equitably moot. They argue that the appeal, if successful,
would necessitate the reversal or unraveling of the entire
plan of reorganization. We disagree. There are intermediate
options. The releases (or some of the releases) could be
stricken from the plan without undoing other portions of it.
We draw instruction in this regard from In re Chateaugay
Corp., 167 B.R. 776, 780 (S.D.N.Y. 1994), in which the
court stated that

> [i]t is difficult to conceive how a potential liability of, at
> most, several million dollars could unravel the Debtors'
> reorganization, which involved the transfer of billions of
> dollars, and which has resulted in the revival of
> Debtors into a multibillion dollar operation with $200
> million in working capital . . . appellees have made no
> showing that it would "knock the props out from under
> the authorization for every transaction that has taken
> place and create an unmanageable, uncontrollable
> situation for the Bankruptcy Court."

(quoting In re Chateaugay Corp., 10 F.3d 944, 952 (2d Cir.
1993)).

In balancing the policy favoring finality of bankruptcy
court judgments--particularly reorganization plans--
against other considerations, we conclude that the equities
here do not require dismissal. Huff has clearly been an
active participant in the reorganization and was heard at
length in the confirmation hearing, and in that sense has
had its day in court. It seeks to invalidate releases that
affect the rights and liabilities of third parties. The plan has
been substantially consummated, but, as noted above, the
plan could go forward even if the releases were struck, and
Huff 's reply brief suggests that it now seeks only
alterations to the plan rather than an unraveling of the
reorganization. Cf. In re Continental Airlines , 203 F.3d 203,
210 (3d Cir. 2000) (Continental II) (rejecting equitable
mootness argument as inadequately pled, but noting also
that the argument was unlikely to succeed because"[n]o

18

evidence or arguments have been presented that Plaintiffs' appeal, if successful, would necessitate the reversal or unraveling of the entire plan of reorganization"). We therefore hold that this appeal should not be dismissed for equitable mootness.

III. The Absolute Priority Rule

Section 1129(b)(2) of the Bankruptcy Code requires that creditors be paid in full before holders of equity receive any distribution. It reads in pertinent part:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> . . .
>
> (b) With respect to a class of unsecured claims--
>
> . . .
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. S 1129(b)(2). This provision is the "absolute priority rule." Huff contends that the District Court erred in confirming the plan because, by releasing the claims arising out of the recapitalization, the plan awarded an interest to old equity (KKR and the other participants in the reorganization) "on account of " their interest in the estate in violation of the absolute priority rule. Huff 's theory has several components. First, it makes the legal argument that under Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership , 526 U.S. 434 (1999), the Supreme Court's most recent case construing S 1129(b)(2), no junior class of creditors or interest holders may receive or retain any property under a plan in which a rejecting class of creditors is not being paid in full. Second, Huff submits that the District Court erred in concluding that the claims were eliminated because they were unlikely to succeed and potentially costly to the debtors to pursue. The success of this contention depends

19

on Huff 's ability to establish that the Examiner and the District Court erred in concluding that the claims were unlikely to succeed. We begin by discussing 203 North LaSalle.

A.

In 203 North LaSalle, 526 U.S. 434 (1999), the Supreme Court held that, even if it is assumed that there is a new value corollary to the absolute priority rule (which would allow old equity to contribute new value and receive interest in the reorganized entity in exchange), allowing junior interest holders to have an exclusive opportunity to obtain an interest in a reorganized entity by providing new value, free from competition and without market valuation, violates S 1129(b)(2)(B)(ii). See id. at 458.10 This is because the exclusive opportunity to invest in the reorganized entity (and receive equity in it thereby) must be considered property received "on account of " the junior claim (the equity interest). Id. Huff argues that the plan, by releasing the claims arising out of the leveraged recapitalization held by the bankrupt entity against holders of junior equity (such as KKR) even though senior creditors were not paid in full, essentially transferred property to those holders of junior equity in violation of the absolute priority rule.

There can be little doubt that a legal claim is property within the meaning of the Bankruptcy Code. See Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 350 (3d Cir. 1999) (treating estate's legal claims as estate property within the meaning of the Code). Similarly, a release of liability has value cognizable under the Code. Accordingly, when the Debtors extinguished the claims arising out of the

_____

10. For some time, there has been a split of authority regarding whether there is a "new value" exception or corollary to the absolute priority rule.
Such a corollary would mean that, when old equity provides new value under the reorganization plan, any property it receives under the plan would not be considered to be received "on account of " the old equity interest and therefore would not violate the absolute priority rule. The Supreme Court declined to decide whether there is a new value corollary in 203 North LaSalle, 526 U.S. at 454 (1999), and that issue is not presented in this case.

recapitalization, KKR received something of value even though some creditors senior to the equity holder had not been paid in full. KKR is a key potential object of the avoidance claims because it was a moving force in the reorganization, and a holder of equity in the Debtors. Thus, if KKR benefitted from the releases "on account of " its interest in the Debtors, then the plan violated the absolute priority rule.

In 203 North LaSalle, the Supreme Court interpreted the "on account of " language in S 1129(B)(2)(b)(ii). The Court rejected arguments that "on account of " means "in satisfaction of " the interest or "in exchange for" the interest and concluded that it means "because of " the interest. 526 U.S. at 450-51. Accordingly, a causal connection between holding the prior claim or interest, and receiving or retaining property, will trigger the absolute priority rule. The degree of causation required is not defined specifically in 203 North LaSalle, because the Court concluded that on either of several views the creditor's objection in that case would require rejection of the plan at issue. See id. at 454. Nevertheless, the Court provided a few points of reference for defining prohibited "on account of " transactions.

First, the Court rejected the amicus curiae position of the United States, which had contended that, under a reorganization plan, old equity should not be allowed to take any property of the debtor if creditors are not paid in full. See id. at 451. The Court said that this "starchy" position could not be correct because, under this view of the absolute priority rule, Congress would have omitted entirely the phrase "on account of." Id. at 451-52. This confirms that there are some cases in which property can transfer to junior interests not "on account of " those interests but for other reasons.

Second, in considering the necessary level of causation, the Court looked to the two basic goals of Chapter 11: those of "preserving going concerns and maximizing property available to satisfy creditors." Id. at 453. While emphasizing that it was not providing "an exhaustive list of the requirements," id., the Court explained:

> Causation between the old equity's holdings and
> subsequent property substantial enough to disqualify a

21

plan would presumably occur on this view of things whenever old equity's later property would come at a price that failed to provide the greatest possible addition to the bankruptcy estate, and it would always come at a price too low when the equity holders obtained or preserved an ownership interest for less than someone else would have paid.

Id. at 453 (citations omitted).

B.

We do not believe that these releases were made"on account of " KKR's junior interest as that phrase is construed in 203 North LaSalle. What doomed the plan in 203 North LaSalle was not that old equity received property under the plan, but the "exclusivity" that old equity enjoyed, which suggested that old equity might have obtained the interest for less than someone else might have paid.11 Under the 203 North LaSalle plan, old equity set the price for the interest it obtained under the plan, and the right to set this price amounted to a property right in itself:

Hence it is that the exclusiveness of the opportunity with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended "on account of " the old equity position and therefore subject to an unpaid senior creditor class's objection.

Id. at 456.

In this case, to the extent that KKR and the other entities that benefitted from the releases had an exclusive

_____

11. Huff argues that 203 North LaSalle's prohibition on exclusive opportunities was violated here because the Debtors had the exclusive opportunity to dispose of the Debtors' property. However, to read 203 North LaSalle so broadly would be to undermine the express statutory provision for exclusivity in S 1121(b), which provides "[e]xcept as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter." See In re Zenith Electronics, 241 B.R. 92, 106 (Bankr. D. Del. 1999) (making this point). This we decline to do.

22

opportunity to gain the release in the reorganization, it was only because they were on the radar screen as potentially liable parties. Huff has adduced no evidence that they sought out the releases or set a price for them; indeed, Huff itself made several offers for the claims, which were considered and rejected, demonstrating that KKR enjoyed no exclusivity of opportunity.12

The District Court held that the decision to extinguish the claims arising out of the recapitalization was made because the claims were adjudged to have a negative value to the estate and not because the junior creditors persuaded the Debtors to release them "on account of " their interest in the Debtors and in violation of the absolute priority rule. It concluded that the claims were extinguished for three reasons. First, it was persuaded by the Examiner's conclusion that there was a low likelihood of recovery on the claims. At the stay hearing, the Court noted that

> I have to say I was sitting at the end of the confirmation hearing, still waiting to hear the facts that would convince me that there . . . was value to be had . . . and I never heard that. And I remain convinced that there was every opportunity to make that record, and that record was not made.

The Examiner concluded that the prospects for successfully prosecuting the claims were "not promising." He noted that, as a factual matter, the recapitalization transaction differed markedly from prior highly leveraged transactions that had been found to be unlawful insofar as the risks of the transaction were born by the acquirer (KKR) and other unsecured creditors and not by pre-transaction creditors. Second, the Court concluded that the potential cost to the

_____

12. Huff has argued that its own willingness to buy the claims from the bankruptcy estate shows that the claims did have value (and thus, by implication, that they were extinguished not because they lacked value but because they had value that the junior creditors saw and managed to capture in violation of the absolute priority rule). But Huff offered only
$100,000 plus some portion of any future recovery. We do not think that relatively meager and arguably strategic offer demonstrates that the claims would have had more value to the estate if they had been preserved or sold to Huff than they did under the reorganization plan.

23

estate of prosecuting the action and defending and paying indemnification claims, cross claims, and counterclaims arising out of the prosecution was high. Third, the Court believed that there was some likelihood that the Banks and the subordinated noteholders, as participants in the leveraged recapitalization, would be estopped from recovering on the claims.

Huff and HSBC do not challenge the Examiner's (and the District Court's) factual findings, which, at all events, are well supported, but contend that the Examiner's analysis of the value of the claims was flawed because he made a legal error in determining that a court would evaluate the claims on an enterprise evaluation basis, and thus he incorrectly concluded that the claims were unlikely to succeed. It is on this basis that they challenge the finding made by the Examiner and accepted by the District Court that the claims were of little value to the estate. Their theory is that the claims did have substantial value and thus that the District Court erred in concluding that the claims were released because they were adjudged to be unlikely to succeed.

C.

The Examiner analyzed the viability of any claims arising out of the recapitalization primarily under Alabama law.13 Two types of fraudulent transfers, actual and constructive, are within the scope of the Alabama Fraudulent Transfer Act, ALA. CODE 1975, S 8-9A-1 et seq. See McPherson Oil Co., Inc. v. Massey, 643 So.2d 595, 596 (Ala. 1994). An actual fraudulent transfer is one made by a debtor who transfers assets "with actual intent to hinder, delay, or defraud any creditor of the debtor." ALA. CODE 1975, S 8-9A-4(a). The trial court considers several factors in determining whether the debtor possessed the requisite intent, including to

_____

13. Huff does not challenge the decision to analyze claims arising out of the recapitalization under Alabama law. The Examiner canvassed choice of law rules and determined that Alabama law would apply to the claims whether suit was filed within the Third Circuit or in Alabama because Alabama's contacts with Bruno's generally, and with the recapitalization specifically, exceeded all others in quantity, substance, and significance.

whom the transfer was made, the amount of assets transferred, and the financial condition of the debtor before and after the transfer. See id., S8-9A-4(b); McPherson Oil, 643 So.2d at 596. A constructive fraudulent transfer occurs when a debtor transfers assets to another without consideration, and the debtor was, or became, insolvent at the time of the transfer. See ALA. CODE 1975, S 8-9A-5(a); McPherson Oil, 643 So.2d at 596; Champion v. Locklear, 523 So.2d 336, 338 (Ala. 1988).

The parties have focused on potential constructive fraudulent transfer claims.14 To succeed on a claim of constructive fraudulent transfer arising out of the recapitalization, a claimant would have to show that Bruno's was insolvent or left with unreasonably small capital at the time of the recapitalization.15 Based on the conclusion that the leveraged recapitalization did not render Bruno's insolvent or leave it with unreasonably small capital, the Examiner concluded that the claims had little value.16 He noted as well that, because KKR bore most of the risk of the transaction, the chance that KKR would be held liable for constructive fraudulent transfer was remote.

Huff would have us reject the Examiner's conclusions that Bruno's was solvent after the recapitalization on the basis that the Examiner used an incorrect method to evaluate solvency. Huff argues that the Examiner erred by evaluating solvency on a "business enterprise" method rather than a "piecemeal or asset-by-asset" valuation method (which does not take goodwill into account except

_____

14. The Examiner concluded that the chances that a claim for actual fraudulent transfer would succeed were remote.

15. The Examiner concluded that the fraudulent transfer claims would not be barred under the applicable statutes of limitations, and no one has challenged that conclusion.

16. The Examiner also concluded that there was a reasonable possibility that the subordinated noteholders and the Banks would be estopped from sharing in any fraudulent transfer recoveries. In this regard, it is significant that 87% of the debtors' creditors (i.e. the senior lenders and the subordinated noteholders) participated in the recapitalization.

25

insofar as the entity includes separately saleable intangibles).17

The Examiner used the business enterprise method, as opposed to the asset-by-asset method, after extensive analysis of the case law. He concluded that it was unlikely that a court would analyze fraudulent conveyance claims under the asset-by-asset test and that the business enterprise method was consistent with generally accepted accounting principles (GAAP) and appropriate under the circumstances. We conclude that the District Court's decision to credit the Examiner's Report, which concluded that the business enterprise approach was the appropriate measure of solvency, was not error. The Alabama Fraudulent Transfer Act does not appear to require an asset-by-asset approach.18 The statute limits the definition of assets without excluding assets, such as goodwill, that are typically included in the business enterprise analysis

_____

17. The Examiner actually used an "adjusted business enterprise" method, in which he considered short-term liabilities, which are often left out of a business enterprise analysis. He did so because he concluded that a court analyzing fraudulent transfer would include short term liabilities in an assessment of liabilities. The Examiner also considered contingent and off-balance sheet liabilities for the same reason.

18. The statute provides that

> (a) A debtor is insolvent if the sum of the debtor's debts is greater
> than all of the debtor's assets at a fair valuation.
>
> (b) A debtor who is generally not paying his debts as they become due is presumed to be insolvent.
>
> ***
>
> (d) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.
>
> (e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

ALA. CODE 1975 S 8-9A-2. No evaluation method is specified by the statute, which does not define "fair valuation."

26

but not in an asset-by-asset evaluation. See ALA. CODE 1975 S 8-9A-2.

Moreover, however value is analyzed, it is clear that Bruno's functioned soundly for several years after the recapitalization, paying its debts (including all interest payments) and successfully renegotiating the interest rates on some of its loans. Huff has given us no reason to conclude that the Examiner incorrectly determined that Bruno's was solvent at the time of the recapitalization. Huff itself initially invested in Bruno's in December 1995 (four months after the recapitalization). It made additional investments in 1996 and early 1997, and in October 1997 Huff 's analysts were still recommending Bruno's as a "buy." Importantly, and as the District Court noted, at the time of the recapitalization Huff 's own experts agreed that Bruno's was solvent:

> The credit analysis prepared by Huff 's financial analyst, Allen Gurevich, in August 1995 (Debtor's Exhibit 18) and the testimony of Huff 's portfolio manager (tr. pp 122-123) and Huff 's inside attorney Bryan Bloom (tr. 166-0167) that the fair market value of Bruno's at the time of the Leveraged Recapitalization in August 1995 approximated 1.1 billion.

And as the Examiner noted, "in connection with the transaction, other sophisticated financial inst[itutions] relied on KKR's projections. From interviews with representatives of all of these institutions and a review of thousands of documents, the Examiner is aware of no instance in which these institutions contemporaneously challenged the reasonableness of KKR's projections for Bruno's." Huff 's challenge to the Examiner's and the District Court's finding that the leveraged recapitalization did not render Bruno's insolvent is unavailing.

As noted above, Huff does not challenge the Examiner's factual findings, and we find no error in District Court's decision to accept the Examiner's decision to evaluate the claims using the business enterprise method. Huff 's remaining argument that the release of the claims was on account of the interest amounts to an argument from res ipsa loquitur: KKR had an equity interest in the corporation,

27

and therefore the Debtors must have made the releases for that reason. If we were to accept this position, without some evidence of a causal relationship, any time that old equity received anything of value under a reorganization plan we would have to conclude that it was received "on account of " the interest--the position rejected by the Supreme Court in 203 North LaSalle. See 526 U.S. at 451-52. In this regard, it is significant that claims against all participants in the recapitalization, and not just KKR, were extinguished, including all claims against the noteholders (including Huff) and all claims against the shareholders who were bought out in the recapitalization (who were the managers of the company when it made the deal for the reorganization).

The evidence compels the conclusion that the claims were extinguished because, in the judgment of the plan proponents, extinguishment was the approach most likely to provide the greatest possible addition to the bankruptcy estate. To be sure, the releases were not subjected to a formal "market test," as 203 North LaSalle suggests may be required. However, in these circumstances, the Examiner's finding that the claims had little to no value, which was accepted by the District Court, was an appropriate surrogate for a market test and an acceptable safeguard.

We thus conclude that the District Court did not err in concluding that the potential cost of defending and paying indemnification claims, cross claims, and counterclaims arising out of the prosecution of the claims was high, and that the claims were extinguished not on account of KKR's interest in the Debtors, but because the Debtors determined that they were unlikely to have any value. The Examiner's and the District Court's conclusions that the claims were unlikely to succeed and were potentially costly to pursue are legally and factually supported. Huff has failed to demonstrate the requisite causal relationship between the transfer of value and KKR's interest in the Debtors. Therefore, we conclude that the plan did not violate the absolute priority rule.

This is not to say that a reorganization plan can transfer assets whenever the Trustee or the Debtor-in-Possession judges that to do so would be in the best interest of the

28

reorganized entity. Rather, we announce a narrow rule that, without direct evidence of causation, releasing potential claims against junior equity does not violate the absolute priority rule in the particular circumstance in which the estate's claims are of only marginal viability and could be costly for the reorganized entity to pursue.

IV. Good Faith

Huff contends that the plan should not have been confirmed because the District Court erred in determining that it was proposed in good faith. Section 1129(a)(3) provides that the court shall confirm a plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. S 1129(a)(3)."[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 n.5 (3d Cir. 1986) (quoting In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1984)) (alteration in original). The District Court's determinations of fact pertaining to good faith are reviewed for clear error. Cf. Abbotts Dairies, 788 F.2d at 147 (holding that the standard of review for good faith under S 363(m) of the Code is mixed:"we exercise plenary review of the legal standard applied by the district and bankruptcy courts, but review the latter court's findings of fact on a clearly erroneous standard") (citations omitted).

Huff contends that the plan was not proposed in good faith because the releases from any claims arising out of the recapitalization were made in a collusive quid pro quo for the waiver of preferences. Huff 's theory of bad faith is that KKR orchestrated the reorganization and controlled the Debtors throughout the reorganization in order to avoid potential liability arising out of the leveraged recapitalization, and that it persuaded the other creditors to agree to the reorganization plan by including the waiver of preferences.

As the District Court found, however, the timing of the releases belies this argument; there is scant evidence tying

29

the release of the claims arising out of the recapitalization to the waiver of preferences. The Debtors decided not to pursue the preferences on March 17, 1999. One month later, the Committee passed a resolution preserving the claims arising out of the recapitalization until further information could be gathered about them. This shows that a month after the Debtors decided not to pursue the preferences, the Committee had not decided whether to release the claims arising out of the recapitalization plans.

At the confirmation hearing, Ms. Schirmang, co-chair of the Committee, testified that the Debtors did not release the claims arising out of the leveraged recapitalization in a quid pro quo deal for the preference claims. She testified that, when the Committee decided to release the claims in May 1999, it did so "in the interest of getting the plan into the hands of creditors and hopefully getting a distribution as soon as possible and getting the Debtor out of bankruptcy." Ms. Schirmang also testified that the preference waivers were intended to maintain and rehabilitate post-petition relationships within the trade, and that there was nothing unusual about the waiver of preferences: "to be honest with you, I have never seen a reorganized debtor pursuing preference actions." The trade creditors who benefitted from the waivers included key suppliers to the business. See note 3, supra. Huff has not presented anything but innuendo in support of its argument that the Debtors failed to act in good faith. Given the record evidence, we conclude that the District Court's finding that the plan was proposed in good faith was not in error.

V. Conformity to Applicable Provision of
    Title II of the Code

Section 1129(a)(1) provides that the court shall confirm a plan if it "complies with the applicable provisions of this title." 11 U.S.C. S 1129(a)(1). This requires that the plan conform to the applicable provisions of Title II. See Lawrence P. King, Collier on BankruptcyP 1129.03[1], 1129-25 (15th ed. rev. 1996). Huff argues that the plan should not have been confirmed because it violates several provisions of Title II.

30

A. Section 510(a)

Section 510(a) provides that a "subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." Huff argues that it had subrogation rights under the indenture which are violated by the terms of the plan. The relevant provision of the indenture provides that

> [a]fter all senior indebtedness has been paid in full . . . . Holders shall be subrogated . . . to the rights of holder of Senior Indebtedness to receive distributions [from the debtors] applicable to Senior Indebtedness to the extent that distributions otherwise payable to the Holders have been applied to the payment of Senior Indebtedness. No payments or distributions to the holders of Senior Indebtedness to which the Holders of the Securities or the Trustee would be entitled except for the provisions of this Article . . . shall, as between the Company, its creditors other than holders of the Senior Indebtedness and the Holders of the Securities, be deemed to be a payment by the Company to or on account of Senior Indebtedness.

The subordination agreement is an intercreditor arrangement between the Banks (the senior indebtedness) and the subordinated noteholders. It does not relieve the Debtors of their payment obligations on the subordinated notes. But the subordinated noteholders' subrogation rights under the indenture described in these provisions never arose because the Banks' claims were not paid in full under the plan. There is no question that the Banks were not paid in full under the reorganization plan, because the reorganized entity was worth at most $340 million, whereas the Banks had claims of $421 million.

Huff argues that the subordinated noteholders had a right under this provision to subrogation. More specifically, Huff argues that it should be awarded warrants to purchase common stock if and when the reorganized company reaches a value of $421 million. But the bankruptcy estate is evaluated and distributions made at the time of the effective date of the reorganization plan. See

31

11 U.S.C. S 1129(b)(2)(B)(i) (referring to "value, as of the effective date of the plan"). After that date, there are no remaining claims under which Huff could assert subrogation rights. This contention therefore fails.

Huff also argues that under an additional clause, the so-called X clause, the subordinated noteholders should get securities in the new entity subordinated to the Banks' interests to the same extent that they had an interest in the old entity.19 The clause states that

> [u]ntil all Obligations with respect to Senior Indebtedness (as provided in Subsection above) are paid in full in cash or cash equivalent, any distribution to which holders would be entitled but for this article shall be made to holders of Senior Indebtedness (except that Holder may receive (i) securities that are subordinated to at least the same extent as the Securities to (a) Senior Indebtedness and (b) any securities issue in exchange for Senior Indebtedness), as their interests may appear.

This clause does not apply to the current situation. The clause requires that, if the Debtors distribute securities to the subordinated noteholders, the general obligation to turn over distributions to Senior Indebtedness is waived so long as the new securities are subordinated "to the same extent as" the existing subordinated debt.

As the Seventh Circuit has explained, these clauses are quite common, and are intended to avoid a procedure of requiring junior creditors to turn over securities and then receive them back once senior creditors are paid in full:

> [s]uch clauses are common in bond debentures, although there is no standard wording. Without the clause, the subordination agreement that it qualifies would require the junior creditors to turn over to the senior creditors any securities that they had received as a distribution in the reorganization, unless the senior creditors had been paid in full. Then,

---

19. The Debtors argue that this issue was not raised in the District Court, but we are satisfied that it was raised in HSBC's objections to the plan, and in Huff 's argument to the District Court.

32

presumably, if the senior creditors obtained full
payment by liquidating some of the securities that had
been turned over, the remaining securities would be
turned back over to the junior creditors. The X Clause
shortcuts this cumbersome procedure and enhances
the marketability of the securities received by the
junior creditors, since their right to possess (as distinct
from pocket the proceeds of) the securities is
uninterrupted.

In the Matter of Envirodyne Indus., Inc., 29 F.3d 301, 306
(7th Cir. 1994). We agree. The clause is not a requirement
that the Debtors distribute to the subordinated noteholders
subordinated securities, or warrants to purchase securities,
if the reorganized entity does well in the future so that the
Banks (the Senior Indebtedness) make back their losses, in
proportion to any securities distributed to Senior
Indebtedness.

Huff makes one final argument under this section--that
the provision of the indenture that states that"nothing in
the indenture shall impair, as between the Company and
the holders, the obligation of the Company, which is
absolute and unconditional, to pay principal of and interest
on the Securities in accordance with their terms," requires
the Debtors to preserve a recovery for the noteholders with
the issuance of securities junior to the common stock. This
is a misreading of the provision, which simply provides that
the subordination agreement is an intercreditor
arrangement, i.e., an arrangement between the Banks (the
senior indebtedness) and the subordinated noteholders,
and does not relieve the Debtors of their payment
obligations on the subordinated notes.

B. Section 524(e)

Section 524(e) provides that "[e]xcept as provided in
subsection (a)(3) of this section,[20 ] discharge of a debt of

_____

20. Subsection (a)(3) provides that a discharge of a case under Title II

    operates as an injunction against the commencement or
    continuation of an action, the employment of process, or an act, to

33

the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. S 524(e). Huff argues that the release in Paragraph 58 of the confirmation order violates S 524(e), because it affects the liability of the members of the Committee and professionals who provided services to the Debtors to third parties. However, we believe that Paragraph 58, which is apparently a commonplace provision in Chapter 11 plans, does not affect the liability of these parties, but rather states the standard of liability under the Code, and thus does not come within the meaning of 524(e).21

Section 524(e) "makes clear that the bankruptcy discharge of the debtor, by itself, does not operate to relieve non-debtors of their liabilities." In re Continental Airlines, 203 F.3d 203, 211 (3d Cir. 2000) (Continental II ) (citations omitted). Section 524(e), by its terms, only provides that a discharge of the debtor does not affect the liability of non-debtors on claims by third parties against them for the debt discharged in bankruptcy. Thus, for example, S 524(e) makes clear that a discharge in bankruptcy does not

_____

        collect or recover from, or offset against, property of the debtor of
        the kind specified in section 541(a)(2) of this title that is acquired
        after the commencement of the case, on account of any allowable
        community claim, except a community claim that is excepted from
        discharge under section 523, 1228(a)(1), or 1328(c)(1) of this title, or
        that would be so excepted, determined in accordance with the
        provisions of sections 523(c) and 523(d) of this title, in a case
        concerning the debtor's spouse commenced on the date of the filing
        of the petition in the case concerning the debtor, whether or not
        discharge of the debt based on such community claim is waived.

11 U.S.C. 524(a)(3).

21. HSBC argues more generally that "[t]he most obvious defect of the Plan is that it incorporates releases and provides for extinction of causes of action against non debtor third parties for no consideration." It argues that under In re Continental Airlines, 203 F.3d 203, 211 (3d Cir. 2000), a plan with releases is unconfirmable as a matter of law. HSBC reads S 524(e) and Continental II too broadly. Section 524(e) provides that the bankruptcy discharge of the debtor does not operate to relieve non-debtors of their liabilities, but by its terms it does not govern provisions in a plan by which a debtor releases its own claims against third parties.

extinguish claims by third parties against guarantors or directors and officers of the debtor for the debt discharged in bankruptcy. Indeed, Continental II held that a plan that enjoined plaintiffs' actions against the debtor's directors and officers who "ha[d] not formally availed themselves of the benefits and burdens of the bankruptcy process," id. at 211, violated S 524(e), id. at 214. The injunction in that plan protected directors and officers from actions taken prior to bankruptcy that allegedly violated the securities laws and thus abrogated the liability of third parties.

Paragraph 58 does not similarly affect the liability of third parties. Paragraph 58 provides that

> [n]one of the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee or any of their respective members, officers, directors, employees, advisors, professionals or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee and each of their respective members, officers, directors, employees, advisors, professionals and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the plan.

Under Paragraph 58, members of the Committee and professionals who provided services to the Debtors remain liable for willful misconduct or gross negligence. Because we conclude that this standard of liability is the standard that already applies in this situation, we believe that Paragraph 58 affects no change in liability.

Section 1103(c) of the Bankruptcy Code, which grants to the Committee broad authority to formulate a plan and perform "such other services as are in the interest of those represented," 11 U.S.C. S 1103(c), has been interpreted to

35

imply both a fiduciary duty to committee constituents and
a limited grant of immunity to committee members, see In
re L.F. Rothschild Holdings, Inc., 163 B.R. 45, 49 (S.D.N.Y.
1994); In re Drexel Burnham Lambert Group, Inc. , 138 B.R.
717, 722 (Bankr. S.D.N.Y. 1992), aff 'd, 140 B.R. 347
(S.D.N.Y. 1992); In re Tucker Freight Lines, Inc., 62 B.R.
213, 216, 218 (Bankr. W.D. Mich. 1986); Lawrence P. King,
Collier on Bankruptcy P 1103.05[4], 1103-32-33 (15th ed.
rev. 1996) ("[A]ctions against committee members in their
capacity as such should be discouraged. If members of the
committee can be sued by persons unhappy with the
committee's performance during the case or unhappy with
the outcome of the case, it will be extremely difficult to find
members to serve on an official committee.").

This immunity covers committee members for actions
within the scope of their duties. The committee members
and the debtor are entitled to retain professional services to
assist in the reorganization. In Pan Am Corp. v. Delta
Airlines, Inc., 175 B.R. 438, 514 (S.D.N.Y. 1994), it was held
that committee members and those professionals who
provide services to the debtor with respect to
reorganization, or to the committee members in their
capacity as committee members, however, do remain liable
for willful misconduct or ultra vires acts.

We agree with this interpretation of S 1103(c) and hold
that it limits liability of a committee to willful misconduct
or ultra vires acts. The release in Paragraph 58 sets forth
the appropriate standard for liability that would apply to
actions against the committee members and the entities
that provided services to the Committee in the event that
they were sued for their participation in the reorganization.22

───────────────────────────────────────────────────────────

22. Huff also argues that the failure of the Debtors to enforce the
subordinated noteholders' subrogation rights violates S 524(e) and calls
this a provision "extinguish[ing] the Noteholders' rights to seek
recoveries
directly against the Banks," which constitutes an impermissible non-
consensual third-party release. However, this argument is specious for
the same reason that Huff 's main argument about the surbordination
agreement is specious: the subordinated noteholders' subrogation rights
only arise when the senior lenders are paid in full. As noted above, the
senior creditors in this case were not paid in full under the plan.

36

It does not affect the liability of another entity on a debt of the debtor within the meaning of S 524(e).

Nothing in our recent opinion in Continental II is to the contrary. In that case, we held that a plan that enjoined plaintiffs' actions against Continental's directors and officers violated S 524(e). Id. at 214. The release in question here differs from that in Continental II in a fundamental way: it sets forth the applicable standard of liability under S 1103(c) rather than eliminating it altogether. In Continental II, we concluded that it was clear under any rule that the court might adopt that the releases at issue were impermissible because "the hallmarks of permissible non-consensual releases--fairness, necessity to the reorganization, and specific factual findings to support these conclusions--are all absent here." Id. at 214. We did not treat S 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of third parties. See id. Because of the differences between the releases in the two cases, Continental II does not compel the conclusion that this release is impermissible. Indeed, because this release does not affect the liability of third parties, but rather sets forth the appropriate standard of liability, we believe that this release is outside the scope of S 524(e).

C. Sections 363 and 1123

Section 363 governs the sale of assets outside of the reorganization plan. It permits the trustee (or the debtor-in-possession), after notice and a hearing, to use, sell, or lease property of the estate outside of the ordinary course of business. See 11 U.S.C. S 363(b)(1); In re Rickel Home Centers, 209 F.3d 291, 297 (3d Cir. 2000). Section 1123(b)(4) provides that a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. S 1123(b)(4). Huff characterizes the reorganization plan as involving a sale of assets and tries to transform these two sections of the Bankruptcy Code into a general duty to fully market the company, similar to the duty recognized by the Delaware Supreme Court in the context of corporate change in

control transactions. See Paramount Communications v. QVC Network, 637 A.2d 34, 43 (Del. 1994); Revlon, Inc. v. MacAndrews & Forbes Holdings, 506 A.2d 173, 182 (Del. 1986).

This argument fails because these provisions of the Code, even if they do impose a duty to fully market assets in some circumstances (a question we do not address), are simply inapplicable to this situation. The plan wiped out old equity and issued new stock to the creditors. For tax purposes, this transaction was accomplished by transferring substantially all of the assets of the Debtors to a creditors' representative and immediately thereafter to the newly created Bruno's Supermarkets, a corporation whose equity is owned by the senior lenders. But just because a transaction is a sale or exchange for tax purposes does not mean that it is a sale within the meaning of the Code. See In re PCH Assocs., 804 F.2d 193, 201 (2d Cir. 1986) (looking to the economic substance of the transaction to determine whether it was a sale or a lease within the meaning of the Code). In a similar case, Major's Furniture Mart, Inc. v. Castle Credit Corp., 602 F.2d 538, 546 (3d Cir. 1979), we stated that

> [i]t is apparent to us that on this record none of the risks present in a true sale is present here. Nor has the custom of the parties or their relationship, as found by the district court, given rise to more than a debtor/creditor relationship in which Major's' debt was secured by a transfer of Major's' customer accounts to Castle . . . . Accordingly, we hold that on this record the district court did not err in determining that the true nature of the transaction between Major's and Castle was a secured loan, not a sale.

That the assets passed though the hands of a creditors' representative before being returned to the reorganized Debtors does not transform this plan from a stand-alone, internally generated plan of reorganization to a sale of assets to a third party. To hold otherwise would be to read S 1129 of the Code as characterizing the many reorganizations involving the transfer of control from a corporation's old equity to its creditors as involving a sale, a position without support in our jurisprudence.

38

D. Section 1129(a)(2)

Section 1129(a)(2) provides that the court shall confirm a plan only if "[t]he proponent of the plan complies with the applicable provisions of this Title." 11 U.S.C.S 1129(a)(2). We agree with the District Court's conclusion that S 1129(a)(2) requires that the plan proponent comply with the adequate disclosure requirements of S 1125.23 Title 11 U.S.C. S 1125(b) mandates the filing of a disclosure statement containing "adequate information." Huff argues that the plan proponents failed to comply with the disclosure requirements by failing to provide adequate information regarding the release of the preferences. The Debtors respond that Huff does not have standing to raise this argument.

Appellate standing in bankruptcy cases is more limited than standing under Article III or the prudential requirements associated therewith. "Generally, litigants in federal court are barred from asserting the constitutional rights of others." Kane v. Johns–Manville Corp., 843 F.2d 636, 643 (2d Cir. 1988) (citing Warth v. Seldin , 422 U.S. 490, 499, 509 (1975)). The court in Kane explained why limits on third–party standing are particularly relevant to appellate standing in bankruptcy proceedings:

> Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that other party is present in the proceedings and is capable of representing himself. Third–party standing is of special concern in the bankruptcy context where, as here, one constituency before the

_____

23. Other courts also have found S 1125 to be one of the applicable provisions of the Code referenced to in S 1129. See, e.g., Tenn–Fla Partners v. First Union Nat'l Bank of Fla., 229 B.R. 720, 732 (W.D. Tenn. 1999); In re Trans World Airlines, Inc., 185 B.R. 302, 313 (Bankr. E.D.Mo. 1995) ("The principal purpose of section 1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the disclosure requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the plan."); see also
Lawrence P. King, Collier on BankruptcyP 1129.03[2] at 1126–26.1 & n.14 (15th ed. rev. 1996).

court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan. In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights.

Id. at 644; see also Travelers Ins. Co. v. H.K. Porter Co., Inc., 45 F.3d 737, 741 (3d Cir. 1995) (adopting the reasoning of Kane).

Title 11 U.S.C. S 1109(b)--which provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter"--confers broad standing at the trial level. However, courts do not extend that provision to appellate standing:

This rule of appellate standing is derived from former section 39(c) of the Bankruptcy Act of 1898, which permitted only a "person aggrieved" to appeal an order of the bankruptcy court. 11 U.S.C. S 67(c) (1976) (repealed 1978). Although the present Bankruptcy Code does not contain any express restrictions on appellate standing, courts have uniformly held that the "person aggrieved" standard is applicable to cases under the Code.

Kane, 843 F.2d at 641-42.

This court has emphasized that appellate standing in bankruptcy cases is limited to "person[s] aggrieved." Travelers Ins. Co., 45 F.3d at 741. We consider a person to be aggrieved only if the bankruptcy court's order "diminishes their property, increases their burdens, or impairs their rights." In re Dykes, 10 F.3d 184, 187 (3d Cir. 1993) (citation omitted). Thus, only those "whose rights or interests are directly and adversely affected pecuniarily" by an order of the bankruptcy court may bring an appeal. Id. (internal quotation marks and citation omitted). The "person aggrieved" standard is more stringent than the constitutional test for standing. In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 530 (3d Cir. 1999).

Huff contends that Bruno's failed to disclose that it had not done a thorough analysis of preference claims before deciding not to pursue them. But Huff itself was aware of this alleged failing at the time and pointed it out to the other creditors when it opposed the plan. Huff clearly would not have acted any differently if the disclosure had been made as it now argues it should have been. Similarly, because Huff pointed out the alleged failure to disclose in its statements protesting the plan, it cannot show that it was personally aggrieved because other creditors might have voted differently if they had had the information allegedly missing from the disclosure. Since Huff cannot show that it was personally aggrieved by any failure to disclose, we conclude that Huff does not have standing to raise this claim. See In re Middle Plantation of Williamsburg, Inc., 47 B.R. 884, 891 (E.D. Va. 1984) ("Holders of impaired claims who have been induced to vote in favor of a plan are the only ones who may raise the issue of the adequacy of the Disclosure Statement."), aff 'd, 755 F.2d 928 (4th Cir. 1985).

We do not foreclose the possibility that, in another case, a creditor objecting to a plan for lack of disclosure that actually had the information it complains is missing from the disclosure might nevertheless have standing if it could show that there is a possibility that other creditors would have acted differently (thus benefitting the protesting creditor) if they had had the same information. See In re Perez, 30 F.3d 1209, 1217 (9th Cir. 1994) (concluding that a creditor had standing on this theory). But in this case, because Huff itself made the information available to the other creditors, it has not made such a showing. The chance that the other creditors would have acted differently is simply too speculative to be a basis for third party standing here.

E. Section 1129(a)(7)

Section 1129(a)(7) provides that a court shall confirm a plan only if

      With respect to each impaired class of claims or interests--

41

(A) each holder of a claim or interest of such class--

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

11 U.S.C. S 1129(a)(7). The District Court found that the Debtors have demonstrated at the Confirmation Hearing that creditors rejecting the plan would not receive a greater recovery in a Chapter 7 liquidation. We review this factual finding for clear error.

Huff failed to challenge the Debtors' liquidation analysis. Huff also did not introduce evidence to demonstrate that the recapitalization claims have significant value or that it was in the best interests of the estate to pursue the preference claims. And as noted above, the Examiner's District Court findings to the contrary are well supported. Accordingly, the District Court did not commit clear error in holding that the Debtors met their burden under S 1129(a)(7).

VI. Conclusion

For the foregoing reasons, the Order of the District Court confirming the Debtor's Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit